# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ELIZABETH NEEL, et al.,

                                    Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

                                    Defendants.

Case No.:  18-CV-1764 W (MSB)

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART AMY MEIDINGER'S MOTION TO DISMISS [DOC. 16]; AND**

**(2) DENYING COUNTY OF SAN DIEGO'S MOTION TO DISMISS [DOC. 17]**

     Pending before the Court are two motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Defendants Amy Meidinger and County of San Diego. [Docs. 16, 17.]  The Court decides the matter on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d)(1).  For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Meidinger's motion and **DENIES** the County's motion.

//

//

//

//

//

1

## I. BACKGROUND

The First Amended Complaint ("FAC") alleges the following facts. (*FAC* [Doc. 13].)

Plaintiffs David and Elizabeth Neel live in the City of San Diego. (*FAC* [Doc. 13] ¶ 10.) In July of 2017, their two children Rg.N and Rs.N were 2 and 3 years old, respectively. (*See id.*) On the evening of July 11, 2017, the Neels noticed a slight bruise that looked like dirt along Rs.N's left jaw line. (*Id.* [Doc. 13] ¶ 11.) This was the third injury Rs.N. had sustained at his daycare. (*Id.*)

The first such injury occurred in March of 2016, when a daycare teacher slammed a door on Rs.N.'s left pinky finger, fracturing it. (*FAC* [Doc. 13] ¶ 12.) The second injury to Rs.N. at the daycare occurred on April 12, 2016. On that date, Rs.N. suffered a broken femur when a daycare teacher turned her back from children playing on a slide. (*FAC* [Doc. 13] ¶ 13.) Following that incident, the Neels called in a referral to the County of San Diego's Child Protective Services hotline, alleging that the facility was abusing Rs.N. (*Id.*) Yet the family allegedly kept taking their children to the same daycare facility. (*See id.* [Doc. 13] ¶¶ 11–16.)

On July 12, 2017, Mrs. Neel reported the bruise in question to a teacher at the daycare,[1] stating that she had discovered it just after Rs.N. had returned from the facility the day before. (*FAC* [Doc. 13] ¶ 15.) She told the teacher that Rs.N. had said that one of his friends had hit him. (*Id.*) Mrs. Neel had asked if there were any incident reports about the injury and was told that there were none. (*Id.*)

On July 14, 2017, when dropping off the children at the daycare, Mrs. Neel was told that the director of the daycare had filled out an incident report about Rs.N.'s bruise, and that Mrs. Neel would need to sign the report. (*FAC* [Doc. 13] ¶ 16.) Mrs. Neel was told that Rs.N. had reported to teachers that Mr. Neel had hit him. (*Id.*) Mrs. Neel again

---

[1] The FAC appears to use the terms "daycare" and "preschool" interchangeably. The Court will do the same.

told the daycare that Rs.N. had told her three days before that his friend had hit him, causing the bruise.  Mrs. Neel did not sign the report.  (*Id.*)

Unbeknownst to the Neels, the director of Rs.N.'s daycare had already reported the bruise to the County of San Diego.  The referral was assigned to Defendant Meidinger.  (*FAC* [Doc. 13] ¶ 17.)

Without seeking parental consent and without a warrant, on that same Friday, July 14, 2017, Meidinger traveled to Rs.N. and Rg.N.'s schools and removed the 2 and 3-year-old children from their classrooms using her authority as a social worker.  (*FAC* [Doc. 13] ¶ 19.)  Meidinger detained the children alone in separate rooms.  (*Id.*)  Meidinger questioned both the 2-year-old and the 3-year-old.  (*Id.* [Doc. 13] ¶¶ 20–22.)  The FAC alleges that Meidinger knew that Rs.N. had been previously injured at the daycare facility.  (*Id.* [Doc. 13] ¶ 19.)

Later that day, Meidinger went to the Neel home.  (*FAC* [Doc. 13] ¶ 23.)  Mrs. Neel told Meidinger that the bruise on Rs.N. was discovered after Rs.N. got home from daycare, and that Rs.N. told her that it had been caused by another child hitting him.  (*Id.*)  Mrs. Neel told Meidinger about the two prior injuries at the daycare, and that the family's attorney was preparing to file a lawsuit against the daycare.  (*Id.*)  Meidinger told Mrs. Neel that Rs.N. had to be examined by a doctor immediately, and that the County's child abuse specialist would need to be advised as to the results of that examination.  (*FAC* [Doc. 13] ¶ 24.)  Mrs. Neel drove to the medical office on the naval base to see if there was any availability to examine Rs.N.  (*Id.*)  The staff informed Mrs. Neel that there was no same-day availability, but that she could return with Rs.N. Monday.  (*Id.* [Doc. 13] ¶ 25.)

Mrs. Neel told Meidinger that she would take Rs.N. to the doctor on Monday.  (*FAC* [Doc. 13] ¶ 25.)  Meidinger replied that Monday was not soon enough, that she would have to take Rs.N. to Balboa Naval Hospital to be seen immediately, and that if she did not comply, military police would be summoned to remove her three-year-old

18-CV-1764 W (MSB)

child from the family home. (*Id.* [Doc. 13] ¶¶ 25–26.) Faced with the threat of losing her child, Mrs. Neel took Rs.N. to the hospital immediately. (*Id.*)

Mrs. Neel arrived at the Balboa Naval Hospital Emergency Room with Rs.N. at about 2:45 p.m. on July 14, 2017. (*FAC* [Doc. 13] ¶ 27.) When assigned to a room, Meidinger told them that they could not leave. Rs.N. was fully undressed by medical personnel and photographed. The small bruise on the left cheek was the only injury found. No medical personnel on site recommended any further procedures. Still, Meidinger demanded that the E.R. doctor call a naval child abuse expert for a consult. Unfortunately, this expert was on leave. (*Id.*)

At this point, Mrs. Neel asked if she could leave with Rs.N. (*FAC* [Doc. 13] ¶ 28.) Meidinger said no. Meidinger informed Mrs. Neel that "paperwork" had been "filed" to require that Rs.N. stay at the hospital for further testing ordered by Meidinger or the County. Mrs. Neel was told that police would be called if she attempted to take her three-year-old son home from the hospital. (*Id.*) Neither Meidinger nor her supervisor ever obtained a court order authorizing the Rs.N.'s detention, or her removal from her parents. (*Id.* [Doc. 13] ¶ 30.)

Throughout the evening of July 14, Meidinger repeated her order that the Neels not remove their child from the hospital. (*FAC* [Doc. 13] ¶¶ 31–32.) At no point did she obtain a court order authorizing Rs.N.'s detention or removal from her parents. (*See id.* [Doc. 13] ¶¶ 30, 33.) At about 10:00 p.m., Meidinger told Mr. Neel that Rs.N. would be immediately transported to Rady Children's Hospital to be seen by a specialist. (*Id.* [Doc. 13] ¶ 32.) Mr. Neel asked Meidinger if he could drive Rs.N. himself. Meidinger said no. An ambulance would drive Rs.N. Mr. Neel would have to follow behind. (*Id.*)

At about 3:00 a.m., Rs.N. was awakened and transported by ambulance to Rady's Children's Hospital. (*FAC* [Doc. 13] ¶ 33.) At Rady's, Rs.N. was subjected to medical tests without a parent's consent or a court order. (*Id.*) Rady's doctors performed another full examination. They confirmed that the bruise was a "normal childhood injury" and that there was no indication of abuse. The doctor reported this to Meidinger, who finally

4

agreed to return Rs.N. to the care of her family at noon on July 15—the next day.  This was 22 hours after the initial hospital visit.  (*Id.* [Doc. 13] ¶¶ 33–34.)

## II.  Legal Standard

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint.  See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory.  Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990).  In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party."  Vasquez v. L.A. Cnty., 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

Well-pled allegations in the complaint are assumed true, but a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences.  See Papasan v. Allain, 478 U.S. 265, 286 (1986); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001) (as amended).

//
//
//
//

5

# III. DISCUSSION

## A. Meidinger's Motion to Dismiss

### 1. Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation omitted)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " Id. (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotation omitted)). There need not be a case directly on point, but " 'existing precedent must have placed the statutory or constitutional question beyond debate.' " Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)) "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court "mandated a two-step sequence for resolving government officials' qualified immunity claims." Pearson v. Callahan, 555 U.S. 223, 232 (2009).

> First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. 533 U.S., at 201, 121 S.Ct. 2151. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Ibid. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

Id. In Pearson, the Court held that the two-step process of Saucier is a discretionary one. 555 U.S. at 236 ("[W]hile the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.")

The two-step analytical framework of <u>Saucier</u> is appropriate here, and the Court will follow it.

### a) Rg.N. and Rs.N.'s Fourth Amendment Claims

### (1) Seizures of Toddlers at Daycare Without a Court Order in the Absence of an Emergency Violates the Fourth Amendment.

Meidinger contends that she did not seize the two-year-old Rg.N. or the three-year-old Rs.N. by isolating them and questioning them outside the presence of their parents. (*Meidinger MTD* [Doc. 16-1] 5:25–6:26.)  This assessment is not consistent with the law.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  <u>Nat'l Treasury Employees Union v. Von Raab</u>, 489 U.S. 656, 681 (1989).  Fourth Amendment jurisprudence defines a seizure as "meaningful interference, however brief, with an individual's freedom of movement."  <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 n.5 (1984).  "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980).

Meidinger's position is that the two-year-old and three-year-old in question should have felt free to leave the room with her because "Plaintiffs do not allege that any police officers displaying weapons were present" and "[t]hey also do not allege that multiple social workers or other figures of authority were present[.]"  (*Meidinger MTD* [Doc. 16-1] 5:25–6:9.)  The children in question were two and three years old.  It goes without

7

saying that a reasonable two-year-old or three-year-old would not have felt free to leave while being questioned by a state actor outside the presence of parents.  See Mendenhall, 446 U.S. at 554.  The FAC alleges that Meidinger seized Rs.N. and Rg.N.

Meidinger does not argue that the seizures were reasonable.  (*Meidinger Mot.* [Doc. 16-1] 5:25–8:20.)  Instead, she argues that the special needs exception should apply to exempt the search from the probable cause and warrant requirements.  Indeed, even when explicitly ordered to brief whether the seizure was reasonable (*Mar. 26, 2019 Order* [Doc. 25]), Defendants opted to again argue that the narrow and closely guarded "special needs" doctrine exempted it from the probable cause requirement.  (*Defs.' Supp. Brief* [Doc. 26].)  As follows, the special needs exemption is inapplicable.  In the absence of exigent circumstances, nothing about the context of social workers entering a school to question children makes the warrant or probable cause requirements impracticable.

### (2)    The "Special Needs" Exception Does Not Apply.

The Supreme Court has permitted exceptions to the probable cause requirement "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' "[2]  Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) (quoting New Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in judgment)).  For example, law enforcement officers may stop and frisk suspects for weapons without probable cause so as to protect their own safety.  See T.L.O., 469 U.S. at 352 (Blackmun, J., concurring in judgment); Terry v. Ohio, 392 U.S. 1, 30–31 (1968).  Government employers and supervisors may conduct warrantless, work-related searches of employees' desks and offices without probable cause.  Griffin, 483 U.S. at 873 (citing O'Connor v. Ortega, 480 U.S. 709 (1987)).  School officials may conduct warrantless searches of some student property without probable cause.  T.L.O.,

---

[2] Meidinger's brief omits the final phrase from this quote.  (*Meidinger MTD* [Doc. 16-1] 7:3–5.)

8

469 U.S. at 327–48.  The impracticability of the warrant and probable cause requirement justifies the special needs exception in each of these instances.  See Griffin, 483 U.S. at 873.  As it can allow for " 'suspicionless searches,' " the special needs exception is a " 'closely guarded category[.]' "  Ferguson v. City of Charleston, 532 U.S. 67, 77 (2001) (quoting Chandler v. Miller, 520 U.S. 305, 309 (1997)).

"The Court's 'special needs' analysis involves two steps: (1) determining whether the government has articulated a valid 'special need [beyond the normal need for law enforcement that would make the warrant and probable-cause requirement impracticable];' and, (2) analyzing whether the proposed administrative search is justified in light of that articulated 'special need.' "  Sanchez v. County of San Diego, 464 F.3d 916, 925 (9th Cir. 2006) (quoting United States v. Scott, 450 F.3d 863, 869–72 (9th Cir. 2006)).

Meidinger argues for an extension of the special needs exception to allow social workers investigating child abuse to conduct seizures at schools without probable cause. (*Meidinger MTD* [Doc. 16-1] 7:1–8:20.)  She reasons that social workers face a special need to protect children in abuse investigations.  (*Id.*)  Yet she offers no reasoning as to why this need would make it difficult to involve the judiciary, absent an emergency, such as would make the warrant or probable cause requirements impracticable.

There is a well-developed body of law describing the constitutional requirements for removing children from their parents' custody.  See, e.g., Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 2000) ("Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.").  "[T]he state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse."  Id. (citing Croft v. Westmoreland Cnty. Children and Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997)).

9

"[P]olice cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed." Id. (citing Sevigny v. Dicksey, 846 F.2d 953, 957 (4th Cir. 1988)).

Meidinger seeks to establish an avenue for circumventing this precedent in the context of seizing children from a school. (*Meidinger MTD* [Doc. 16-1] 7:1–8:20.) She does not explain why, outside of an emergency situation, judicial involvement in the process would be impracticable when the child in question is at a school—especially when there is abundant caselaw to the contrary as to removing children from parental custody.

The FAC alleges a violation of the Fourth Amendment through the seizures of Rg.N. and Rs.N. at the daycare facility.

> **(3) The FAC Alleges Insufficient Facts to Support a Violation of Clearly Established Fourth Amendment Rights through Warrantless Interviews at the Daycare.**

The next question is whether the right in question was clearly established at the time. Pearson, 555 U.S. at 232. On the facts alleged, it was not.

" '[C]learly established law' should not be defined 'at a high level of generality.' " White v. Pauly, 137 S. Ct. 548, 552 (2017) (quoting al-Kidd, 563 U.S. at 742). "Of course, 'general statements of the law are not inherently incapable of giving fair and clear warning' to officers, United States v. Lanier, 520 U.S. 259, 271 (1997), but 'in the light of pre-existing law the unlawfulness must be apparent[.]' " Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "In other words, [qualified] immunity protects all but the plainly incompetent or those who knowingly violate the law." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (quoting White, 137 S. Ct. at 551).

The FAC alleges that Meidinger isolated and questioned a two-year-old and a three-year-old without parental consent, probable cause, or a court order. (*FAC* [Doc. 13] ¶¶ 46–47.) However, the FAC also explicitly alleges that Meidinger knew three-year-old Rs.N. had a facial bruise and was currently in the custody of the very same daycare facility where he had been seriously injured on two other occasions in the past. (*Id.* [Doc. 13] ¶ 19.) Even if the facts did not give rise to reasonable cause to believe Rg.N. and Rs.N. were in imminent danger of abuse, <u>Wallis</u>, 202 F.3d at 1138, on these facts the Court cannot draw a plausible inference that taking immediate action to question the two children was either plain incompetence or knowing violation of the law. <u>See</u> <u>Kisela</u>, 138 S. Ct. at 1152.

Meidinger is entitled to qualified immunity for her actions in interviewing the children at the daycare. Her motion to dismiss the first claim for relief in the FAC as to the Fourth Amendment violation and the second claim for relief in the FAC will both be granted.[3]

//

//

//

//

//

---

[3] Plaintiffs contend in opposition that Meidinger also violated their Fourth Amendment rights "by seizing and detaining [Rs.N.] for 22 hours to subject him to medical procedures, including examinations, that were unnecessary and unwarranted." (*Pls.' Opp'n to Meidinger MTD* [Doc. 21] 10:11–11:14.)

The FAC does not allege this theory in sufficient detail to comport with Rule 8. (*FAC* [Doc. 13] ¶¶ 39–44, 45–50.) Though the first and second claims for relief in the FAC incorporate introductory paragraphs by reference (which include factual allegations as to Meidinger's conduct at the hospital (*FAC* [Doc. 13] ¶¶ 1–38)), it is not clear from reading the FAC that this conduct is meant to serve as the basis for a Fourth Amendment claim. As detailed below, Plaintiffs will have leave to amend to allege this theory.

### b) The Fourteenth Amendment Claims

#### (1) Meidinger Does Not show the Children's Due Process Claims as to the Seizures at the School to be Duplicative of their Fourth Amendment Claims.

As a preliminary matter, Meidinger argues that "to the extent Plaintiffs assert that the school interviews violated minor Plaintiffs' Fourteenth Amendment rights, such allegations are duplicative of minor Plaintiffs' Fourth Amendment claim[s]" and should be dismissed. (*Meidinger MTD* [Doc. 16-1] 9:22–10:10.)

" '[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' " Cty. of Sacramento v. Lewis, 523 U.S. 833, 843 (1998) (quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)).

In the three sentences she devotes to the issue, Meidinger does not discuss duplication. Nor provide any reasoning as to why she believes the claim should be dismissed. (*Meidinger MTD* [Doc. 16-1] 9:22–10:10.)

#### (2) Forcing Medical Procedures on Children by Threatening their Parents with Family Separation Violated the Fourteenth Amendment.

"It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. §] 1983." Crowe v. Cty. of San Diego, 608 F.3d 406, 441 (9th Cir. 2010) (quoting Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001)). To constitute a violation, such government conduct need be an "unwarranted interference" with the right of familial association. Lee, 250 F.3d at 686. It need not include physical violence, Crowe, 608 F.3d at 431, but "[t]o amount to a violation of substantive due process, . . . the harmful

12

conduct must 'shock [ ] the conscience' or 'offend the community's sense of fair play and decency.' " Rosenbaum v. Washoe Cty., 663 F.3d 1071, 1079 (9th Cir. 2011) (quoting Rochin v. California, 342 U.S. 165, 172–73 (1952)); Crowe, 608 F.3d at 431.

"The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1107 (9th Cir. 2001). "Government officials are required to obtain prior judicial authorization before intruding on a parent's custody of her child unless they possess information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.' " Id. at 1106 (quoting Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 2000)).

Meidinger argues that her forcing medical procedures on three-year-old Rs.N. through explicit threats of family separation "does not 'shock the conscience' because minor Plaintiffs were not physically separated from her parents." (*Meidinger MTD* [Doc. 16-1] 10:11–12:28.) This is not a faithful interpretation of the law.

As discussed in Part III.a.1, *supra*, the FAC alleges that Meidinger forced multiple, overnight medical procedures on a three-year-old by threatening to take him from his family and by misrepresenting that "paperwork had been filed" to require that the child stay at a hospital for medical testing.[4] (*See id.* [Doc. 13] ¶¶ 27–34.) She did not involve the judiciary. (*See id.*) See Mabe, 237 F.3d at 1106. Apart from a single report from a daycare facility at which Meidinger knew this child had been injured twice before, Meidinger allegedly had no reason to believe the Neels were an immediate danger to Rs.N. The course of action she allegedly chose violated the parents' right to be free from

---

[4] The phrase "paperwork had been filed" in this context can be reasonably interpreted to mean the filing of a court order. In the absence of exigency, due process of law would be a prerequisite for an agent of the state to replace a parent in making medical decisions for a child. (*FAC* [Doc. 13] ¶ 28.) See, e.g., Crowe, 608 F.3d at 431, 441.

government intrusion into the family, and to exercise custody over their son by making medical decisions for him. Meidinger's distinction between physical separation and forced medical procedures through threats is not persuasive. The conduct alleged is conscience-shocking. See Crowe, 608 F.3d at 431. And in light of the allegation that Meidinger allowed Mrs. Neel to drive Rs.N. to the hospital in the first instance (*FAC* [Doc. 13] ¶ 27), it is at least plausible there was no emergency vis-à-vis the Neels that would have obviated the need to involve the courts. See Iqbal, 556 U.S. at 678; Mabe, 237 F.3d at 1107.

The FAC adequately alleges a Fourteenth Amendment substantive due process violation.

### (3) Forcing Medical Procedures on Children by Threatening their Parents with Family Separation Violated Clearly Established Rights.

In one sentence, Meidinger argues that "Plaintiffs cannot demonstrate that it was clearly established at the time of the incident that recommending or even requiring a parent to take a child to the doctor's office or a hospital to be further evaluated during a child abuse investigation constitutes a Fourteenth Amendment violation." (*Meidinger MTD* [Doc. 16-1] 15:21–24.) This contention has no merit.

According to the allegations in the FAC, Meidinger did not merely "recommend" that the Neels take their young son to the hospital to be evaluated. She forced medical procedures on a young child by threatening to take him from his parents, and by falsely representing that her actions had been ratified with the formal force of law. This is conscience-shocking behavior. There is little doubt that this conduct from an agent of the state acting under color of authority "offend[s] the community's sense of fair play and decency." See Rosenbaum, 663 F.3d at 1079 (describing the standard). Existing precedent squarely governs these facts. More particularized parallels would not have been necessary to put Meidinger on notice as to the unconstitutionality of her actions.

14

See Kisela, 138 S. Ct. at 1153 (quoting Mullenix, 577 U.S. at 309); White, 137 S. Ct. at 552. ("[I]n the light of pre-existing law the unlawfulness must be apparent[.]" (internal quotation omitted)); Crowe, 608 F.3d at 431; Lee, 250 F.3d at 685; Rosenbaum, 663 F.3d at 1079; Rochin, 342 U.S. at 172–73. Threatening to separate a family so as to force medical procedures on a three-year-old is either clearly incompetent or knowing violation of the law. See Kisela, 138 S. Ct. at 1152.

Meidinger's motion to dismiss will be denied as to the Fourteenth Amendment claims.

### c) The First Amendment Claims

"[T]he First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.' " Lee, 250 F.3d at 685 (quoting Board of Dir. v. Rotary Club, 481 U.S. 537, 545 (1987)). The First and Fourteenth Amendment claims for interference with the right of familial association may be pled and pursued simultaneously. See id.

In a single page, Meidinger argues that the First Amendment claims in the FAC should be dismissed if the Fourteenth Amendment substantive due process claims are dismissed—and for the same reasons. (*Meidinger MTD* [Doc. 16-1] 13.) For the reasons discussed *supra*, Meidinger is not entitled to qualified immunity on the Fourteenth Amendment claims. Her ancillary motion to dismiss the First Amendment claims will also be denied.

//
//
//
//
//

15

### 2. False Imprisonment

#### a) Plaintiffs Sufficiently Allege that Meidinger Detained Rs.N. and Rg.N.

Meidinger moves to dismiss the false imprisonment claim in the FAC (*FAC* [Doc. 13] ¶¶ 64–68) on the basis that "Plaintiffs have not sufficiently alleged that minor Plaintiffs were unlawfully detained at any time during the school interviews or while at the . . . hospital." (*Meidinger MTD* [Doc. 16-1] 16:13–28.)

"Under California law, the elements of a claim for false imprisonment are: '(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief.' " Young v. Cty. of Los Angeles, 655 F.3d 1156, 1169 (9th Cir. 2011) (quoting Easton v. Sutter Coast Hosp., 80 Cal. App. 4th 485, 496 (2000)).

Meidinger's argument here is less than half of a page, and it is not clear which of these two elements she is attacking. As discussed *supra*, the FAC alleges that Meidinger detained a two-year-old and a three-year-old by: (1) isolating them and questioning them at the daycare without informing their parents; and (2) forcing the three-year-old to undergo medical procedures by threatening to take him from his family.

This contention lacks merit.

#### b) Meidinger Does Not Show that She is Entitled to State-law Immunity.

Meidinger asserts immunity for false imprisonment under Cal. Gov. Code §§ 820.2 and 821.6. As Plaintiffs contend in opposition and as Meidinger concedes by not responding to the point in reply, these sections do not provide immunity for false

16

imprisonment.[5] <u>See</u> Cal. Gov. Code § 820.4 ("Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."); <u>Sullivan v. Cty. of Los Angeles</u>, 12 Cal. 3d 710, 719 (1974); <u>Asgari v. City of Los Angeles</u>, 15 Cal. 4th 744, 757 (1997), *as modified on denial of reh'g* (Mar. 17, 1997); <u>Gillan v. City of San Marino</u>, 147 Cal. App. 4th 1033, 1051 (2007), *as modified on denial of reh'g* (Feb. 21, 2007); <u>Liberal v. Estrada</u>, 632 F.3d 1064, 1085 (9th Cir. 2011) ("[T]he immunity provided by California Government Code § 820.2 does not apply to claims of false imprisonment or false arrest predicated on an officer's detaining a suspect without reasonable suspicion or probable cause.")

Meidinger's motion to dismiss will be denied.

## B.     The County's Motion to Dismiss

### 1.     The FAC Alleges the Violation of Constitutional Rights.

The County's first argument is contingent on Meidinger's motion to dismiss. (*County MTD* [Doc. 17-1] 4:1–11.)  The County reasons that the FAC does not allege sufficient facts to show a constitutional violation by Meidinger, and that as a result there can be no municipal liability.  (*Id.*)  As discussed in Part III.A., *supra*, the premise of the County's argument is flawed.

### 2.     Plaintiffs Sufficiently Allege a Municipal Policy.

Next, the County argues that the FAC does not allege enough facts to support its allegation of a municipal policy, as required for § 1983 liability under <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978).  (*County MTD* [Doc. 17-1] 4:12–7:2.)

---

[5] Meidinger asserts a distinct form of immunity for the first time in her reply brief.  (*Meidinger Reply* [Doc. 23] 7:9–8:14.)  The Court disregards the argument.  <u>Zamani v. Carnes</u>, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.")

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 691; Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 403 (1997). Instead, a municipality can only be held liable under § 1983 when " 'action pursuant to official municipal policy of some nature cause[s] a constitutional tort.' " Christie v. Iopa, 176 F.3d 1231, 1235 (9th Cir. 1999) (quoting Monell, 436 U.S. at 691). "Through its deliberate conduct, the municipality [must be] the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404. " 'The official policy requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.' " Id. at 417 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479–80 (1986)) (internal quotation omitted) (emphasis omitted).

"Although a constitutional violation must result from 'official municipal policy,' a county need not expressly adopt the policy. It is sufficient that the constitutional violation occurred pursuant to a 'longstanding practice or custom.' " Christie, 176 F.3d at 1235 (quoting Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992)). Such a longstanding practice or custom must "constitute[] the 'standard operating procedure' of the local government entity[.]" Gillette, 979 F.2d at 1346 (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)).

The County argues that the FAC does not contain enough facts to support the allegation that one of its policies was the moving force behind the alleged constitutional violations. (*County MTD* [Doc. 17] 4:12–7:2.) The several pages the County spends on this argument are devoid of persuasive reasoning. The FAC alleges a number of policies in some detail. (*FAC* [Doc. 13] ¶ 58.) Several of these have clear bearing on the facts alleged in the FAC. For instance, Plaintiffs allege:

18

> [t]he policy of causing minor children to be seized and interviewed at school without [c]ourt [o]rder, parental consent, parental knowledge, parental presence, and without just and reasonable cause;
>
> [t]he failure to train and supervise social workers and supervisors as [t]o the requirement of exigent circumstances and the obtaining of protective custody warrants for the seizure, interview, detaining, and/or removal of children;
>
> . . . deliberate indifference in implementing a policy of inadequate training, and/or failing to train and supervise its officers, agents, and employees, in providing the Constitutional protections guaranteed to individuals, including those under the First, Fourth and Fourteenth Amendments, and under California law, when performing actions related to the investigations of child abuse and neglect; [and]
>
> [t]he policy of acting with deliberate indifference in failing to correct . . . the wrongful conduct of its employees in failing to provide the Constitutional protections guaranteed to individuals, including those under the First, Fourth and Fourteenth Amendments, when performing actions related to the investigation of child abuse and neglect.

(*Id.*)  It is not clear what more the County would require of Plaintiffs here.  To satisfy Rule 8, they need provide only "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2)—enough factual matter, "accepted as true, to 'state a claim to relief that is plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  They have done that.  To the extent they may

allege other policies not clearly tied to the factual allegations of the FAC, that does not warrant dismissal of the claim under Rule 12(b)(6).[6]

### 3. The County Does Not Show that the State-law Claims Against it Should be Dismissed.

The County moves to dismiss the state-law claims against it on the basis that Meidinger is immune under Cal. Gov. Code §§ 820.2 and 821.6, and that as a result it cannot be liable on a *respondeat superior* basis. However, as discussed in Part III.A., *supra*, these immunities do not apply to shield Meidinger from liability. The County's reasoning is inapplicable.[7]

//
//
//
//
//
//
//

---

[6] The County represents in the first line of its reply brief (without citation) that "Plaintiffs concede that they have not pled sufficient facts to support their federal municipal liability claims against the County." (*County MTD Reply* [Doc. 24] 1.) This is not the case.

Plaintiffs' opposition states, "Plaintiffs believe they have alleged and identified specific facts to establish that it was the County's policies, procedures, customs and/or practices . . . that were the 'moving force' behind the . . . constitutional violations." (*Pls.' Opp'n to County MTD* [Doc. 22] 7:10–8:4.) They state, "[h]owever, Plaintiffs concede the allegations could include more specific reference to the County's formal policies and longstanding practices with the facts supporting them." (*Id.*) They request leave to amend in order to add more detail. Their request will be granted.

[7] Like Meidinger, the County asserts a distinct form of immunity for the first time in its reply brief. (*County Reply* [Doc. 24] 3:10–22.) For the same reasons discussed in note 5, *supra*, the Court disregards the argument. <u>Zamani</u>, 491 F.3d at 997.

# IV. CONCLUSION & ORDER

For the foregoing reasons, Defendant Meidinger's motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

Specifically, Meidinger's motion to dismiss is granted as to the first claim for relief as pertaining to the Fourth Amendment, and as to the second claim for relief. The motion is otherwise denied.

Defendant County of San Diego's motion to dismiss is **DENIED**.

Plaintiffs will have leave to amend in accordance with the terms of this order.[8] Any amended pleading must be filed on or before **Thursday, May 9, 2019**.


**IT IS SO ORDERED.**


Dated:  April 25, 2019

_____
Hon. Thomas J. Whelan
United States District Judge

---

[8] See Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").