# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH NEEL, et al.,<br><br>                  Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>                  Defendants. | Case No.: 18-CV-1764 W (MSB)<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART AMY MEIDINGER'S MOTION TO DISMISS [DOC. 33]; AND**<br><br>**(2) GRANTING IN PART AND DENYING IN PART THE COUNTY OF SAN DIEGO'S MOTION TO DISMISS [DOC. 34]** |

    Pending before the Court are two motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Defendants Amy Meidinger and County of San Diego. [Docs. 33, 34.] The Court decides the matter on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** both motions.

//
//
//
//

1

## I. BACKGROUND

The Second Amended Complaint ("SAC") alleges the following facts. (*SAC* [Doc. 32].)

Plaintiffs David and Elizabeth Neel live in the City of San Diego. (*SAC* [Doc. 32] ¶ 10.) In July of 2017, their two children Rg.N and Rs.N were 2 and 3 years old, respectively. (*See id.* [Doc. 32] ¶¶ 10–11.) On the evening of July 11, 2017, the Neels noticed a slight bruise that looked like dirt along Rs.N's left jaw line. (*Id.* [Doc. 32] ¶ 11.) This was the third injury Rs.N. had sustained at his daycare. (*Id.*)

The first such injury occurred in March of 2016, when a daycare teacher slammed a door on Rs.N.'s left pinky finger, fracturing it. (S*AC* [Doc. 32] ¶ 12.) The second injury to Rs.N. at the daycare occurred on April 12, 2016. On that date, Rs.N. suffered a broken femur when a daycare teacher turned her back from children playing on a slide. (*SAC* [Doc. 32] ¶ 13.) Following that incident, the Neels called in a referral to the County of San Diego's Child Protective Services hotline, alleging that the facility was abusing Rs.N. (*Id.*) Yet the family allegedly kept taking their children to the same daycare facility. (*See id.* [Doc. 32] ¶¶ 11–16.)

On July 12, 2017, Mrs. Neel reported the bruise in question to a teacher at the daycare,[1] stating that she had discovered it just after Rs.N. had returned from the facility the day before. (*SAC* [Doc. 32] ¶ 15.) She told the teacher that Rs.N. had said that one of his friends had hit him. (*Id.*) Mrs. Neel had asked if there were any incident reports about the injury and was told that there were none. (*Id.*)

On July 14, 2017, when dropping off the children at the daycare, Mrs. Neel was told that the director of the daycare had filled out an incident report about Rs.N.'s bruise, and that Mrs. Neel would need to sign the report. (*SAC* [Doc. 32] ¶ 16.) Mrs. Neel was told that Rs.N. had reported to teachers that Mr. Neel had hit him. (*Id.*) Mrs. Neel again

---

[1] The FAC appears to use the terms "daycare" and "preschool" interchangeably. The Court will do the same.

2

told the daycare that Rs.N. had told her three days before that his friend had hit him, causing the bruise. Mrs. Neel did not sign the report. (*Id.*)

Unbeknownst to the Neels, the director of Rs.N.'s daycare had already reported the bruise to the County of San Diego. The referral was assigned to Defendant Meidinger. (*SAC* [Doc. 32] ¶ 17.)

Without seeking parental consent and without a warrant, on that same Friday, July 14, 2017, Meidinger traveled to Rs.N. and Rg.N.'s schools and removed the 2 and 3-year-old children from their classrooms using her authority as a social worker. (*SAC* [Doc. 32] ¶ 19.) Meidinger detained the children alone in separate rooms. (*Id.*) Meidinger questioned both the 2-year-old and the 3-year-old. (*Id.* [Doc. 32] ¶¶ 20–22.) The SAC alleges that Meidinger knew that Rs.N. had been previously injured at the daycare facility. (*Id.* [Doc. 32] ¶ 19.)

Later that day, Meidinger went to the Neel home. (*SAC* [Doc. 32] ¶ 23.) Mrs. Neel told Meidinger that the bruise on Rs.N. was discovered after Rs.N. got home from daycare, and that Rs.N. told her that it had been caused by another child hitting him. (*Id.*) Mrs. Neel told Meidinger about the two prior injuries at the daycare, and that the family's attorney was preparing to file a lawsuit against the daycare. (*Id.*) Meidinger told Mrs. Neel that Rs.N. had to be examined by a doctor immediately, and that the County's child abuse specialist would need to be advised as to the results of that examination. (*SAC* [Doc. 32] ¶ 24.) Mrs. Neel drove to the medical office on the naval base to see if there was any availability to examine Rs.N. (*Id.* [Doc. 32] ¶ 25.) The staff informed Mrs. Neel that there was no same-day availability, but that she could return with Rs.N. Monday. (*Id.*)

Mrs. Neel told Meidinger that she would take Rs.N. to the doctor on Monday. (*SAC* [Doc. 32] ¶ 25.) Meidinger replied that Monday was not soon enough, that she would have to take Rs.N. to Balboa Naval Hospital to be seen immediately, and that if she did not comply, military police would be summoned to remove her three-year-old

child from the family home. (*Id.* [Doc. 32] ¶¶ 25–26.) Faced with the threat of losing her child, Mrs. Neel took Rs.N. to the hospital immediately. (*Id.*)

Mrs. Neel arrived at the Balboa Naval Hospital Emergency Room with Rs.N. at about 2:45 p.m. on July 14, 2017. (*SAC* [Doc. 32] ¶ 27.) When assigned to a room, Meidinger told them that they could not leave. Rs.N. was fully undressed by medical personnel and photographed. The small bruise on the left cheek was the only injury found. No medical personnel on site recommended any further procedures. Still, Meidinger demanded that the E.R. doctor call a naval child abuse expert for a consult. Unfortunately, this expert was on leave. (*Id.*)

At this point, Mrs. Neel asked if she could leave with Rs.N. (*SAC* [Doc. 32] ¶ 28.) Meidinger said no. Meidinger informed Mrs. Neel that "paperwork" had been "filed" to require that Rs.N. stay at the hospital for further testing ordered by Meidinger or the County. Mrs. Neel was told that police would be called if she attempted to take her three-year-old son home from the hospital. (*Id.*) Neither Meidinger nor her supervisor ever obtained a court order authorizing the Rs.N.'s detention, or her removal from her parents. (*Id.* [Doc. 32] ¶ 30.)

Throughout the evening of July 14, Meidinger repeated her order that the Neels not remove their child from the hospital. (*SAC* [Doc. 32] ¶¶ 31–32.) At about 10:00 p.m., Meidinger told Mr. Neel that Rs.N. would be immediately transported to Rady Children's Hospital to be seen by a specialist. (*Id.* [Doc. 32] ¶ 32.) Mr. Neel asked Meidinger if he could drive Rs.N. himself. Meidinger said no. An ambulance would drive Rs.N. Mr. Neel would have to follow behind. (*Id.*)

At about 3:00 a.m., Rs.N. was awakened and transported by ambulance to Rady's Children's Hospital. (*SAC* [Doc. 32] ¶ 33.) At Rady's, Rs.N. was subjected to more medical tests without a parent's consent or a court order. (*Id.*) Rady's doctors performed another full examination. They confirmed that the bruise was a "normal childhood injury" and that there was no indication of abuse. The doctor reported this to Meidinger,

who finally agreed to return Rs.N. to the care of her family at noon on July 15—the next day. This was 22 hours after the initial hospital visit. (*Id.* [Doc. 32] ¶¶ 33–34.)

## II. Legal Standard

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." Vasquez v. L.A. Cnty., 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

Well-pled allegations in the complaint are assumed true, but a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences. See Papasan v. Allain, 478 U.S. 265, 286 (1986); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001) (as amended).

//
//
//
//

5

III. **DISCUSSION**

    A.    **Meidinger's Motion to Dismiss**

        1.    **Qualified Immunity**

Defendant Meidinger argues that she is entitled to qualified immunity for all constitutional claims brought against her. (*Meidinger MTD II* [Doc. 33-1] 5–17.)

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation omitted)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " Id. (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotation omitted)). There need not be a case directly on point, but " 'existing precedent must have placed the statutory or constitutional question beyond debate.' " Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court "mandated a two-step sequence for resolving government officials' qualified immunity claims." Pearson v. Callahan, 555 U.S. 223, 232 (2009).

> First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. 533 U.S., at 201, 121 S.Ct. 2151. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Ibid. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

Id. In Pearson, the Court held that the two-step process of Saucier is a discretionary one. 555 U.S. at 236 ("[W]hile the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.")

The two-step analytical framework of Saucier is appropriate here, and the Court will follow it.

>   a)  **First and Fourteenth Amendments –**
>       **Right to Familial Association**
>       (1) **The SAC Alleges a Violation of the Right to Familial Association.**

"[T]he First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.' " Lee, 250 F.3d at 685 (quoting Board of Dir. v. Rotary Club, 481 U.S. 537, 545 (1987)). "The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." Roberts v. U.S. Jaycees, 468 U.S. 609, 618 (1984).

"[A] parent has a constitutionally protected liberty interest in the companionship and society of his or her child." Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by* Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999). "[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." Id.; see also Kelson v. City of Springfield, 767 F.2d 651, 653 (9th Cir. 1985). "It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. §] 1983."

7

Crowe v. Cty. of San Diego, 608 F.3d 406, 441 (9th Cir. 2010) (quoting Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001)).

To constitute a substantive due process violation, government conduct need be an "unwarranted interference" with the right of familial association. Lee, 250 F.3d at 686. It need not include physical violence, Crowe, 608 F.3d at 431, but "[t]o amount to a violation of substantive due process, . . . the harmful conduct must 'shock [ ] the conscience' or 'offend the community's sense of fair play and decency.' " Rosenbaum v. Washoe Cty., 663 F.3d 1071, 1079 (9th Cir. 2011) (quoting Rochin v. California, 342 U.S. 165, 172–73 (1952)); Crowe, 608 F.3d at 431.

"The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1107 (9th Cir. 2001). "Government officials are required to obtain prior judicial authorization before intruding on a parent's custody of her child unless they possess information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.' " Id. at 1106 (quoting Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 2000)).

As discussed in the Court's prior order, the FAC alleges that Meidinger forced multiple, overnight medical procedures on a three-year-old by threatening to take him from his family and by misrepresenting that "paperwork had been filed" to require that he stay at a hospital for medical testing. (*See SAC* [Doc. 32] ¶¶ 25–34.) She did not involve the judiciary. See Mabe, 237 F.3d at 1106. Apart from a single report from a daycare facility at which Meidinger knew this child had been injured twice before, Meidinger allegedly had no reason to believe the Neels were an immediate danger to Rs.N. (*Id.* [Doc. 32] ¶¶ 18–19, 21–22.) The course of action she allegedly chose violated the parents' right to be free from government intrusion into the family, and to exercise custody over their son by making medical decisions for him.

8

The SAC alleges a violation of the fundamental right to familial association, protected by the First and Fourteenth Amendments.[2]

### (2) The Alleged Violation Was Clearly Established.

The Court's April 25, 2019 order held that any reasonable social worker in Meidinger's position would have been aware that forcing medical procedures on a three-year-old by threatening to remove him from his mother and by misrepresenting that a court had ratified her actions violated the Fourteenth Amendment. (*Apr. 25, 2019 Order* [Doc. 29] 14:12–15:8.) Now, without moving for reconsideration or discussing the law of the case doctrine, Meidinger argues that the Court erred by discussing "clearly established law" in general terms. (*Meidinger MTD* [Doc. 33-1] 10:24–13:21.) Meidinger is in error.

It seems to be Meidinger's position that in the absence of factual precedent directly on point (i.e. involving a social worker making explicit threats of family separation and misrepresenting judicial involvement to coopt parental decision-making), there can be no clearly established constitutional violation. (*See id.*) This is not the law. See Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018).

There need not be a case directly on point—"existing precedent must have placed the statutory or constitutional question beyond debate." Kisela, 138 S. Ct. at 1152 (quoting White v. Pauly, 137 S. Ct. 548, 551 (2017)). It is beyond reasoned debate that lying and threatening to take a three-year-old from a mother so as to supplant a parent's

---

[2] In a single page, Meidinger argues that she is entitled to qualified immunity for the First Amendment claim asserted against her because the contours of the First Amendment case law protecting it are not sufficiently clear. (*Meidinger MTD II* [Doc. 33-1] 13–14.) This is not persuasive. The Lee opinion made clear in 2001 that the same legal standard may be applied to the First and Fourteenth Amendment claims asserted here. See 250 F.3d at 685–86. Conscience-shocking conduct that violates the right to familial association protected under the Fourteenth Amendment will necessarily impinge on the First Amendment. See id.; Keates v. Koile, 883 F.3d 1228, 1236 (9th Cir. 2018) ("Accordingly, we have held that claims under both the First and Fourteenth Amendment for unwarranted interference with the right to familial association could survive a motion to dismiss.").

medical decision-making is conscience-shocking behavior.  Given the nature of these allegations, more particularized factual precedent would not have been necessary to put Meidinger on notice of the unconstitutionality of her actions.  The SAC alleges a clearly unwarranted interference with the due process right of familial association.[3]  Lee, 250 F.3d at 686; Rosenbaum, 663 F.3d at 1079 ("The purpose of qualified immunity is to ensure that officers are given fair notice of the law that they are required to uphold."); Rochin, 342 U.S. at 172–73; Crowe, 608 F.3d at 431.

### b) Fourth Amendment
#### (1) The SAC Alleges a Seizure of Rs.N.

Meidinger contends that she did not seize three-year-old Rs.N. by employing threats and deception to require the Neels to keep their son at the hospital for medical testing.[4]  (*Meidinger MTD II* [Doc. 33-1] 15:1–17:5.)  She contends that the Fourth Amendment claim is merely "based on Rs.N.'s medical evaluations[,]" and that she could not have seized Rs.N. because the three-year-old was never in custody.  (*Id.*)  This is not persuasive.

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' "  Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 681 (1989) (quoting U.S. Const. amend. IV).  Fourth Amendment jurisprudence defines a seizure as "meaningful interference, however brief, with an individual's freedom of movement."  United States v. Jacobsen, 466 U.S. 109, 113 n.5 (1984).  "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances

---

[3] For the purposes of this motion, the Court assumes true the allegations in the SAC.  See Vasquez, 487 F.3d at 1249.

[4] The Court held on April 25, 2019 that the FAC did not allege enough facts to make out a Fourth Amendment violation through a seizure of Rs.N. at the hospital.  (*Apr. 25, 2019 Order* [Doc. 29] 11:14 n.3.)  Plaintiff has rectified this omission in the SAC.  (*SAC* [Doc. 32] ¶ 41.)

10

surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980).

The SAC provides, as relevant here:

> Defendants MEIDINGER and DOES 1–10 seized and detained Rs.N. for 22 hours and caused him to be subjected to medical procedures, including examinations, that were unnecessary and unwarranted. There was no exigency requiring that Rs.N. be immediately examined, since the "injury" was already a few days old, MEIDINGER had already allowed Rs.N. to travel with his mother to the primary care group to seek an appointment, and the concern was a very small bruise that was almost invisible to the naked eye. MEIDINGER had no court order authorizing her instructions and demands to David and Elizabeth that they take Rs.N. to a doctor or hospital for medical procedures, including examinations. MEIDINGER had no valid parental consent to the 22-hour journey, since MEIDINGER had threatened Elizabeth that she would call the military police and remove the children from David and Elizabeth's custody if Elizabeth did not comply with MIEDINGER's orders.

(*SAC* [Doc. 32] ¶ 41.) The SAC alleges that Meidinger, an agent of the state, told the Neels that "paperwork" had been "filed" to require their child to stay at the hospital and threatened to summon law enforcement to separate them from their son if they attempted to remove him. (*Id.* [Doc. 32] ¶¶ 28, 41.) Rather than availing herself of the judicial process, the SAC alleges that Meidinger employed coercion and deception. This interfered with the Neels' freedom of movement.

The SAC alleges a Fourth Amendment violation. Jacobsen, 466 U.S. at 113 n.5.

### (2) The Alleged Seizure was Clearly Established.

Any reasonable government official in Meidinger's position would have realized that misrepresenting the existence of a court order and threatening to summon police to take a young child from his mother so as to coerce medical testing would meaningfully interfere with a family's freedom of movement. See Mullenix, 136 S. Ct. at 308. Given existing precedent, every reasonable official in Meidinger's position would have known

11

that this course of conduct violated the parents' Fourth Amendment rights. Mullenix v. Luna, 136 S. Ct. 308.

The SAC alleges a clearly established Fourth Amendment violation.

### c) False Imprisonment
#### (1) The SAC Adequately Alleges the Elements of False Imprisonment.

Under California law, "[f]alse imprisonment involves the intentional confinement of another against the person's will. The elements are (1) nonconsensual, intentional confinement of a person, (2) without lawful privilege, (3) for an appreciable period of time, however brief." Bocanegra v. Jakubowski, 241 Cal. App. 4th 848, 855 (2015) (quoting 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts § 426, pp. 642–643); accord Young v. County of Los Angeles, 655 F.3d 1156, 1169 (9th Cir. 2011). Confinement "may be effectuated by means of physical force, threat of force or of arrest, confinement by physical barriers, or by means of any other form of unreasonable duress." Fermino v. Fedco, Inc., 7 Cal. 4th 701, 715 (1994).

Meidinger argues that she "did not falsely imprison Rs.N. at [the two hospitals] . . . because she did not use unreasonable duress or threats under the circumstances." (*Meidinger MTD II* [Doc. 33-1] 18–19.) Once again, without any reasonable cause to believe that three-year-old Rs.N. was in immediate danger, Meidinger allegedly threatened to separate a child from his mother under the authority of a court order that did not exist. (*SAC* [Doc. 32] ¶¶ 26–35.) Meidinger's argument that this conduct does not constitute unreasonable duress or threats under the circumstances is without merit.

Meidinger further argues that she did not falsely imprison the children during the interviews at school. (*Meidinger MTD II* [Doc. 33-1] 19.) She cites to a penal code section allowing for school interviews by social workers. This section allows for the interviews to take place. It does not provide immunity for false imprisonment. Meidinger's argument here is similarly without merit.

**(2)  Meidinger is Entitled to Absolute Quasi-Prosecutorial Immunity for the False Imprisonment Claim Only.**

Meidinger argues that she is entitled to quasi-prosecutorial immunity for her alleged actions at the school and in forcing the medical testing of Rs.N.  (*Meidinger MTD II* [Doc. 33-1] 19–20.)

As a preliminary matter, Meidinger is not entitled to absolute immunity for the § 1983 claims asserted against her in the SAC.[5]  "Parties to section 1983 suits are generally entitled only to immunities that existed at common law."  Beltran v. Santa Clara Cty., 514 F.3d 906, 908 (9th Cir. 2008) (citing Imbler v. Pachtman, 42 U.S. 409, 417–18 (1976)).  Pursuant to this rule, social workers conducting investigations prior to the inception of dependency proceedings are not entitled to absolute immunity.  See id. at 908–09; Buckley v. Fitzsimmons, 509 U.S. 259, 273–74 (1993) ("Qualified immunity 'represents the norm' for executive officers . . . .  There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand . . . .  A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." (quoting Malley v. Briggs, 475 U.S. 335, 340 (1986)) (internal quotations omitted)).

The state-law false imprisonment tort claim asserted against Meidinger is another matter.  In a deviation from the common law, California does afford absolute immunity to social workers for tort claims stemming from their investigatory conduct.  Alicia T., 222 Cal. App. 3d at 881 ("[S]ocial workers must be absolutely immune from suits alleging the improper investigation of child abuse, removal of a minor from the parental home based upon suspicion of abuse and the instigation of dependency proceedings."); Jenkins v. Cty.

---

[5] The motion is ambiguous as to whether the assertion of absolute immunity is limited to the false imprisonment claim.  (*Meidinger MTD II* [Doc. 33-1] 19–20.)

13

of Orange, 212 Cal. App. 3d 278, 288 (1989) (same); Bocanegra v. Jakubowski, 241 Cal. App. 4th 848, 858 (2015) ("Absolute prosecutorial immunity extends to false imprisonment claims."). This rule of California substantive law extends beyond the protections afforded prosecutors at common law. It affords Meidinger immunity as to the false imprisonment cause of action for her investigatory conduct in this case.

The false imprisonment claim against Meidinger will be dismissed without leave to amend.

### d) Punitive Damages

Meidinger argues that Plaintiff's punitive damages prayer must be dismissed because there is no allegation that she acted with the requisite mental state. (*Meidinger MTD II* [Doc. 33-1] 20–21.)

"[P]unitive damages may be assessed under 42 U.S.C. § 1983 when a defendant's conduct is shown to be motivated by evil motive or intent, or if it involves reckless or callous indifference to the federally protected rights of others." Fair Hous. of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002) (citing Smith v. Wade, 461 U.S. 30, 56 (1983)).

As discussed in detail above, the SAC alleges that Meidinger forced medical procedures on a three-year-old by threatening to remove him from his mother and by misrepresenting that a judicial body had ratified her actions. (*See SAC* [Doc. 32] ¶¶ 26–34.) The threats and deception alleged in the SAC imply callous indifference to the constitutional rights of a mother and her child.

Meidinger's motion to dismiss the punitive damages prayer will be denied.

### B. The County of San Diego's Motion to Dismiss

The County makes two arguments in its motion to dismiss: (1) that Meidinger did not violate Mr. and Mrs. Neels' First and Fourteenth Amendment rights by conducting the interviews of Rs.N. and Rg.N. at school; and (2) that the SAC does not plead the

14

existence of any municipal policy in sufficient detail to comport with Rule 8. (*County MTD II* [Doc. 34-1] 3–10.)

### 1. Meidinger Did Not Violate Mr. and Mrs. Neel's First and Fourteenth Amendment Right to Familial Association by Interviewing Rs.N. and Rg.N. at School.

First, the County argues that Meidinger did not violate Mr. and Mrs. Neel's First and Fourteenth Amendment right to familial association by interviewing Rs.N. and Rg.N. at school.[6] (*County MTD II* [Doc. 34] 6–7.)

As discussed in Part III.A.1.a., *supra*, to constitute a substantive due process violation, government conduct need be an "unwarranted interference" with the right of familial association. Lee, 250 F.3d at 686. Such conduct "must 'shock [ ] the conscience' or 'offend the community's sense of fair play and decency.' " Rosenbaum, 663 F.3d at 1079 (quoting Rochin, 342 U.S. at 172–73).

Even under the circumstances described in the SAC, in which the injury in question was days old and in which Meidinger did not seek parental consent to interview the children, a social worker interviewing children at a school is not conscience-shocking behavior. See Rosenbaum, 663 F.3d at 1079.

The First and Fourteenth Amendment Monell claims by Mr. and Mrs. Neel will be dismissed to the extent they are based on interviews of Rs.N. and Rg.N. at the daycare facility.

//
//
//

---

[6] Plaintiffs concede that the alleged violations of Mr. and Mrs. Neel's First and Fourteenth Amendment rights through the school interviews are claims rather than mere legal theories. Thus, they do not contest that Rule 12(b)(6) can be used to dismiss them. (*County MTD II Opp'n* [Doc. 35] 6–9.)

15

## 2. The SAC Sufficiently Alleges a Municipal Policy.

In its second argument, the County contends that the SAC does not allege enough facts to support its allegation of a municipal policy, as required for § 1983 liability under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). (*County MTD II* [Doc. 34-1] 3–5, 7–9.)

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 691; Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 403 (1997). Instead, a municipality can only be held liable under § 1983 when " 'action pursuant to official municipal policy of some nature cause[s] a constitutional tort.' " Christie v. Iopa, 176 F.3d 1231, 1235 (9th Cir. 1999) (quoting Monell, 436 U.S. at 691). "Through its deliberate conduct, the municipality [must be] the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404. " 'The official policy requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.' " Id. at 417 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479–80 (1986)) (internal quotation omitted) (emphasis omitted).

"Although a constitutional violation must result from 'official municipal policy,' a county need not expressly adopt the policy. It is sufficient that the constitutional violation occurred pursuant to a 'longstanding practice or custom.' " Christie, 176 F.3d at 1235 (quoting Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992)). Such a longstanding practice or custom must "constitute[] the 'standard operating procedure' of the local government entity[.]" Gillette, 979 F.2d at 1346 (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)).

The several pages the County spends on this argument lack persuasive reasoning to set this motion apart from the previously decided one. Like the FAC, which has already been held sufficient to comport with Rule 8, the SAC alleges a number of policies in

| | |
|---|---|
| 1 | some detail. (*SAC* [Doc. 32] ¶ 51.) The SAC provides more than enough factual material |
| 2 | by which to allege a plausible theory of municipal liability and raise the right to relief |
| 3 | above a speculative level. <u>Monell</u>, 436 U.S. at 691; <u>Iqbal</u>, 556 U.S. at 678; <u>Twombly</u>, |
| 4 | 550 U.S. at 555. The County has fair notice of the claims against it. <u>See</u> Fed. R. Civ. P. |
| 5 | 8. |
| 6 |      The County's motion will be granted as to the false imprisonment cause of action. |
| 7 | Other than as discussed above, the motion will be denied. |
| 8 | // |
| 9 | // |
| 10 | // |
| 11 | // |
| 12 | // |
| 13 | // |
| 14 | // |
| 15 | // |
| 16 | // |
| 17 | // |
| 18 | // |
| 19 | // |
| 20 | // |
| 21 | // |
| 22 | // |
| 23 | // |
| 24 | // |
| 25 | // |
| 26 | // |
| 27 | // |
| 28 | // |

## IV. CONCLUSION & ORDER

For the foregoing reasons, Defendant Meidinger's motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

Specifically, Meidinger's motion to dismiss is granted as to the third claim for relief. The motion is otherwise denied.

Defendant County of San Diego's motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

Specifically, it is granted as to the second claim for relief as to the First and Fourteenth Amendment Monell claims by Mr. and Mrs. Neel to the extent they are based on interviews of Rs.N. and Rg.N. at the daycare facility.

It is granted as to the third claim for relief.

The motion is otherwise denied.

**IT IS SO ORDERED.**

Dated: August 13, 2019

Hon. Thomas J. Whelan
United States District Judge